Joseph J. GRIMALDI, Defendant,
Appellant,

v.

UNITED STATES of America,
Plaintiff, Appellee.

No. 78–1392.

United States Court of Appeals,
First Circuit.

Argued May 7, 1979.

Decided Sept. 19, 1979.

Certiorari Denied Nov. 26, 1979.
See 100 S.Ct. 465.

Francis J. Scannell, Boston, Mass., by appointment of the court, for appellant.

Paul F. Healy, Jr., Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, MURRAY, Senior District Judge.*

FRANK J. MURRAY, Senior District Judge.

Defendant-appellant, Joseph J. Grimaldi, appeals from his convictions on August 3, 1978 of counterfeiting Federal Reserve notes in violation of 18 U.S.C. § 471, and related crimes[1] in violation of 18 U.S.C.

---

* Of the District of Massachusetts, sitting by designation.

1. Joseph J. Grimaldi was charged in Counts Two and Three with unlawfully photographing genuine Federal Reserve notes (18 U.S.C. § 474), in Counts Four, Five, Six, Seven, Eight, and Nine with unlawfully possessing negatives made in the similitude of various Federal Re-

§ 474, on nine counts of a ten-count indictment. We affirm the convictions.

On February 23, 1978, Special Agents of the United States Secret Service (Agents), armed with a search warrant issued that day by a United States Magistrate, seized items of property in Grimaldi's residence at 28 Brighton Street, Springfield, Massachusetts, and arrested him. Grimaldi moved to suppress as evidence against him at the trial all property seized pursuant to the warrant, on the ground that the Agents had conducted an illegal search of his residence on January 31, 1978 and thus the property seized under the warrant was tainted by the prior illegal intrusion.

On January 31 the Agents met Grimaldi at the office of the Massachusetts Parole Board in Springfield. Grimaldi was then subject to Massachusetts parole supervision, and the meeting was arranged by Grimaldi's parole officer at the behest of the Agents. Prior to the meeting the Agents had been assigned to investigate counterfeiting activities in Springfield involving the passing of numerous counterfeit notes (each designated as C-'6420'), all similar in details and characteristics. The Agents were aware that Grimaldi had purchased printing equipment in August 1977, before the counterfeit notes appeared, and that in November 1977 the New York City police had found certain paraphernalia in a refuse dump in the Bronx apparently related to the manufacture of the notes that had sur-

faced in Springfield. They knew also that Grimaldi had avoided a confrontation at his home with Detective Meara of the Springfield police on January 26, 1978. At the Parole Board office, the Agents engaged Grimaldi in a discussion of his activities, and persuaded him to permit them to visit his home. At his home they made observations in his cellar of certain equipment and books, and as they departed the dwelling they persuaded Grimaldi to let them take a book entitled "Donlon Catalog of United States Small Size Paper Money" and a can of red ink with green stains on the outside of the can. Later, one of the Agents secured information of Grimaldi's book borrowing record from the Springfield Public Library.

The district court held an evidentiary hearing on the motion to suppress, and found that the Agents had coerced Grimaldi to make certain incriminating statements and permit them to enter his home. An order was entered by the court allowing the motion to the extent of excluding from the evidence the items taken by the Agents on January 31, and the information derived from the Agents' discussion with Grimaldi on that day and from the observations made in his home. The motion was denied as to evidence of which the Agents had knowledge prior to their January 31 encounter with Grimaldi. After excluding from the affidavit presented with the application for the warrant the narrative of the events of January 31,[2] the court found the

serve notes (18 U.S.C. § 474), and in Count Ten with unlawfully possessing a plate made in the similitude of a U. S. Treasury seal (18 U.S.C. § 474).

**2.** The paragraph excised from the supporting affidavit follows:

On January 31, 1978, Grimaldi was interviewed by myself and Special Agent Richard Coburn of the Secret Service. After being advised of his constitutional rights, he stated that he was a horse trainer, having no office, with his residence being 28 Brighton Street. He stated that he was in Philadelphia in the fall of 1977, and also in financial difficulty at that time. He further stated that he was in the habit of travelling to the Aqueduct Race Track on Sundays and would go via the New England Thruway. (A check revealed that in

November, 1977, Aqueduct was operating.) Grimaldi was accompanied to 28 Brighton Street, Springfield, Mass., by the undersigned and Agent Coburn. In the cellar of his residence were observed a hand press, a paper cutter, and a can of red ink with green ink stains on the outside. All the foregoing can be used in the printing of counterfeit currency. Observed in the kitchen were books on photo offset printing and a book entitled, "Donlon Catalog of United States Small Size Paper Money", 1971 Ed., by William P. Donlon. Grimaldi stated that he had sold the Multi-Offset press, which fact was verified. During the entire interview, Grimaldi asked numerous times whether fingerprints could be taken from paper.

remaining recitals of the affidavit[3] established probable cause to issue the warrant.

The appellant presents issues on this appeal relating to several aspects of the case. On the denial of the motion to suppress he raises the questions (1) whether the court erred in refusing to suppress all items seized on February 23 where the affidavit supporting the warrant included recitals of illegally obtained evidence, and (2) whether probable cause existed to issue the warrant after the narrative of the January 31 events was excluded from the affidavit. There are the following issues which arose at the trial: (3) whether the district court erred in failing to instruct the jury to disregard certain comments made in the prosecutor's opening statement, and (4) whether the district court committed error in denying defendant's motion for mistrial. Finally, there is the issue (5) whether the testimony of the witness Suprenant should be excluded as "fruit of the poisonous tree". We consider the issues in the order stated.

## I.

Grimaldi argues that because a recital of the statements[4] and items of property[5]

**3.**  **AFFIDAVIT**
Suffolk, ss.    Boston, Massachusetts
February 23, 1978

I, Bruce J. Bowen, am a Special Agent of the U. S. Secret Service and have been so employed for the past one year and ten months. For the past year I have been assigned to the counterfeiting squad of the Boston Office of the Secret Service. My duties include the investigation of violations of federal counterfeiting statutes and I am often called upon to make a determination of whether certain currency is counterfeit or genuine. I have been to schools of the U. S. Treasury Department, having been trained in the production methods of both genuine and counterfeit bills.

On August 17, 1977, Joseph J. Grimaldi purchased a 1250 Addressograph MultiOffset press, a Simple Simon 14 × 18 camera, and an A. B. Dick Model 107 platemaker from the A. L. Larsen Co., Boston, Mass. These machines would be of a type used in the manufacture of counterfeit currency by the offset printing method. Grimaldi picked up the camera and platemaker on August 17, 1977, and the press on August 31, 1977.

On September 19, 1977, a new $10 counterfeit bill was passed by an unidentified person in Marlton, New Jersey. This town is approximately 15 miles from Philadelphia, Pennsylvania. (This $10 note has been designated C–'6420') Since that date, there have been 110 known passes of the C–'6420' $10 counterfeit note, 89 of which have occurred in the Springfield, Mass. area; the latest pass being January 26, 1978, in the Springfield, Mass. area. One $10 C–'6420' counterfeit note has allegedly been passed by James Pepe and another by John Albano. These two men, according to Detective John Meara of the Springfield Police Department, have been past associates of Grimaldi. The C–'6420' notes were made by the photo off-set printing method.

On November 12, 1977, plates, negatives of the C–'6420' note, and sheets with partial C–'6420' notes printed on them were found by the New York Police Department next to the New England Thruway in South Bronx, New York. On February 17, 1978, the fingerprint analysis section of the U. S. Secret Service, Washington, D. C., developed a latent fingerprint identified as Joseph Grimaldi's on the negative of the C–'6420'.

Surveillance was conducted on Grimaldi's residence, a two-story brown wood framehouse located at 28 Brighton St., Springfield, Mass., on January 26, 1978. On that date, Detective Meara went to this residence and asked for Grimaldi. Grimaldi's mother stated that he was not at home. Five minutes later, Grimaldi exited the residence via the rear door and scaled a fence.

\*     \*     \*     \*     \*     \*

Additionally, it was determined from Raymond Farioli, President of Prescott Inks, that Grimaldi had purchased 50 pounds of ink, all basic colors, in the fall of 1977.

Based on the foregoing, it is the belief of the affiant that within the premises of 28 Brighton Street, Springfield, Mass., are concealed, a paper cutter, ink, and other paraphernalia utilized in the manufacture of counterfeit currency and certain counterfeit $10 federal reserve notes.

[signed] BRUCE J. BOWEN
   BRUCE J. BOWEN
   Special Agent
   U.S. Secret Service

Sworn and subscribed to before me on this 23rd day of February, 1978.

[signed] LAWRENCE P. COHEN
   LAWRENCE P. COHEN
   U.S. Magistrate

**4.** The statements "concerning his financial status and  .  .  .  habit of visiting race tracks .  .  .  [and] that he possessed and sold a Multioffset Press".

**5.** The property included a hand press, paper cutter, can of red ink, and several books concerning money and printing of money.

suppressed by the district court was contained in the supporting affidavit for the warrant, the warrant issued "in reliance to a substantial amount on" this evidence, and that therefore all items seized under the warrant should have been suppressed as fruits of the illegal intrusion on January 31. In his argument he constructs an unbroken chain of causation between the illegal search on January 31 and the evidence seized on February 23 by linking the "short time span" between the two dates with the description of the property in the affidavit and warrant. We think the question of suppression of the items seized because of alleged taint attributable to the illegal search cannot be decided on the basis of causation advanced by appellant. Quite clearly this argument overlooks established policies of the exclusionary rule in the setting whether evidence has become "fruit of the poisonous tree".

■ As stated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the constitutional question under the fourth amendment is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." *Id.* at 488, 83 S.Ct. at 417. In practice the Court has

> declined to adopt a *"per se* or 'but for' rule" that would make inadmissible any evidence . . . which somehow came to light through a chain of causation that began with an illegal [activity]. *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

*United States v. Ceccolini,* 435 U.S. 268, 276, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). While it is true, as the Court held in *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939), that the exclusionary prohibition of the unlawfully obtained evidence extends as well to derivative evidence as to the direct products of the unlawful activity, the Court there also reaffirmed the holding of *Silverthorne Lumber*

*Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920), that facts improperly obtained may be proved if knowledge of them is gained from an independent source. We have no doubt that application of the independent-source rule in the context of a search warrant does not offend what we perceive to be the underlying purpose and objectives of the exclusionary rule. *See United States v. Giordano,* 416 U.S. 505, 554–55, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (separate opinion of Powell, J.).

■ It cannot be successfully argued that the validity of a warrant and search turns upon the presence of unlawfully obtained information in the affidavit supporting the warrant. Even though the affidavit included the evidence and statements which were suppressed, the district court was not required to suppress other evidence of which the Agents had gained knowledge from independent and lawful sources. *See Silverthorne Lumber Co. v. United States, supra; Nardone v. United States, supra.* Where the affidavit included illegally obtained evidence as well as evidence derived from independent and lawful sources, a valid search warrant may issue if the lawfully obtained evidence, considered by itself, established probable cause to issue the warrant. *United States v. Plotkin,* 550 F.2d 693, 697 (1st Cir.), *cert. denied,* 434 U.S. 820, 98 S.Ct. 61, 54 L.Ed.2d 76 (1977); *United States v. DiMuro,* 540 F.2d 503, 515 (1st Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977); *United States v. Race,* 529 F.2d 12 (1st Cir. 1976).

There is nothing in the record of the case to show that information acquired by the Agents prior to January 31 came from other than independent and lawful sources. No violations of the fourth amendment rights of appellant in the acquisition of that information has been argued. The evidence which came to light as the direct result of the Agents' unlawful activities on January 31 was suppressed by the district court and in determining the validity of the subsequent search the district court excluded such evidence from its consideration. Al-

though appellant has argued that other evidence was derived from the illegal conduct of the Agents, he has not directed our attention to any such evidence; rather, his contention is that all evidence seized on February 23 was marked with the taint of the illegal activities of January 31 and should be suppressed. For the reasons stated above we disagree.

Finally, appellant argues that the court's failure to exclude evidence seized on February 23 which, as appellant insists, was marked with the taint of the January 31 unlawful activities, "will encourage further inappropriate activities of agent investigators". We recognize that the primary justification for the exclusionary rule is deterrence of police activity that violates fourth amendment rights, but we know of no authority which proscribes the use of evidence, where there is a lawful basis for seizing it, because at some prior phase of the investigative process defendant had been the victim of an illegal search by the police. It is only when the Government seeks to incriminate the victim of the illegal search by use of illegally obtained evidence that the exclusionary rule may be invoked. *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Wong Sun v. United States, supra.*

The district court refused to suppress the information in the affidavit derived from independent and lawful sources. This was the proper course to pursue under the circumstances.

## II.

We address the issue whether probable cause existed to issue the warrant after the narrative of the January 31 events was excised from the supporting affidavit. Issuance of the warrant rested solely on the basis of the affidavit of Bruce J. Bowen, one of the Agents. The warrant authorized search of the appellant's residence and seizure of "a paper cutter, ink, and other paraphernalia used in the manufacture of counterfeit federal reserve notes and certain counterfeit $10 federal reserve notes . . .". We find no merit in the argument [6] of appellant that probable cause was not established by the recitals that remained in the excised affidavit.

Basic to the fourth amendment protections against "unreasonable searches and seizures" is the requirement of probable cause, a requirement that there exists a reasonable probability that the invasion of protected areas involved in the search will be justified by discovery in the place to be searched of items connected with criminal activity. In evaluating appellant's challenge, we interpret the information in the excised affidavit, not with a "grudging or negative attitude", not "technically", but in a "commonsense and realistic fashion". *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

The affidavit makes clear in this case that a neutral magistrate would have had probable cause to believe the crimes of counterfeiting obligations of the United States, and uttering the same, 18 U.S.C. §§ 471, 472, had been committed, and the appellant does not argue to the contrary. Thus the focus of our examination of the affidavit, in its excised condition, must be to determine whether it established probable cause to believe that fruits, instrumentalities or evidence of the crimes were concealed at appellant's home.

After weighing Agent Bowen's qualifications as recited in the affidavit, a magistrate could credit him with expertise as to the nature of the property employed in and methods of production of counterfeit notes. *United States v. Moore*, 562 F.2d 106 (1st Cir. 1977), *cert. denied*, 435 U.S. 926, 98

---

6. Appellant argues that the connection between discovery of the plates and negatives of the C-'6420' notes in New York City on November 12, 1977 and the search of Grimaldi's home in February 1978, is based on stale evidence; that Grimaldi's fingerprint on the photonegative is not "necessarily" evidence of possession of the negative or possession with unlawful intent; that Grimaldi's departure over the fence when Meara called to see him is not evidence of consciousness of guilt of a federal crime; and that the affidavit lacked particular description of the items to be seized.

S.Ct. 1493, 55 L.Ed.2d 521 (1978). From a reading of the affidavit it could reasonably be concluded that it was more than a coincidence when, during the four months after Grimaldi assembled paraphernalia capable of producing counterfeit currency by the photo-offset process, numerous $10 counterfeit notes (at least 80% of all such notes), all similar in details and produced by the photo-offset process, appeared in Springfield. A realistic view of the information would entitle a magistrate to entertain a strong suspicion at the very least that, with his fingerprint on a negative of the notes, Grimaldi was involved in their production and that his hand was important in the criminal activity. From the character of the offset press, camera and platemaker, reasonable and proper inferences could be drawn of the extent of Grimaldi's opportunity to conceal them, and as to where such property would likely be concealed by one engaged in counterfeiting. *See United States v. Melvin*, 596 F.2d 492, 497–98 (1st Cir. 1979); *United States v. Samson*, 533 F.2d 721, 723 (1st Cir.), *cert. denied*, 429 U.S. 845, 97 S.Ct. 126, 50 L.Ed.2d 116 (1976); *Haefeli v. Chernoff*, 526 F.2d 1314, 1318–19 (1st Cir. 1975). Although three months, or more, elapsed between the discovery of plates and negatives by the New York police and the search of Grimaldi's home on February 23, 1978, nothing was discovered in New York to indicate that Grimaldi had not retained the press, camera and platemaker. Moreover, the inference was permissible, from the uttering of a counterfeit C–'6420' note in Springfield on January 26, 1978, that the counterfeiting operation which began in September 1977 was continuing, and it could reasonably be believed that on January 26 Grimaldi was motivated by consciousness of guilt of the presence of counterfeiting equipment in his home when he went over the fence to avoid a confrontation with Meara. *Cf. United States v. Miller*, 589 F.2d 1117 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). Even if it was not shown, as appellant argues, when it was that Grimaldi, Pepe and Albano were keeping company with one another, or that Grimaldi passed any of the notes, it is settled

that property of a "person who the police do indeed suspect but do not have probable cause to arrest . . . may be searched upon probable cause to believe that fruits, instrumentalities, or evidence of the crime are present, even though the products of the search may implicate him". *United States v. Melvin, supra* at 496, citing *Carroll v. United States*, 267 U.S. 132, 158–59, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and *Zurcher v. Stanford Daily*, 436 U.S. 547, 556–58, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). We think that the facts set forth in the supporting affidavit derived from independent and lawful sources considered by themselves, and the inferences that could naturally and properly be drawn therefrom, established a sufficient basis to permit a neutral magistrate reasonably to conclude that the property sought was located at Grimaldi's home at the time the warrant issued. *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

Appellant argues that a particular description of the items to be seized was lacking in the warrant and therefore the warrant did not comply with fourth amendment standards. Although Grimaldi does not specify wherein the description was inadequate, we assume his challenge is to the language "other paraphernalia used in the manufacture of counterfeit federal reserve notes". Under the particularity requirement of the fourth amendment the language must be sufficiently definite to permit the officer executing the warrant reasonably to identify the items to be seized. *United States v. Johnson*, 541 F.2d 1311 (8th Cir. 1976). But the description of the property sought will depend upon whether it can readily be described and distinguished from other property of the same nature, for example, stolen property, or whether the precise identity of the property, such as contraband, may not be ascertainable at the time the warrant issues. Where "the purpose is not to seize specified property, but only property of a specified character, which by reason of its character is contraband, a description by designating its character is sufficient". *People v. Prall*, 314 Ill.

518, 522, 145 N.E. 610, 612 (1924), cited in *United States v. Klein*, 565 F.2d 183, 189–90 n. 10 (1st Cir. 1977). *See also United States v. DePugh*, 452 F.2d 915 (10th Cir. 1971), *cert. denied*, 407 U.S. 920, 92 S.Ct. 2452, 32 L.Ed.2d 805 (1972), *reh. denied*, 409 U.S. 898, 93 S.Ct. 101, 34 L.Ed.2d 157 (1972) ("destructive devices"); *James v. United States*, 416 F.2d 467 (5th Cir. 1969), *cert. denied*, 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970) ("gambling paraphernalia"); *United States v. Johnson, supra* ("marijuana, paraphrenalia [sic], and U.S. currency"); *United States v. Wilson*, 451 F.2d 209 (5th Cir.), *cert. denied*, 405 U.S. 1032, 92 S.Ct. 1298, 31 L.Ed.2d 490 (1971) ("paraphernalia for making coins"). Here the description of the property sought was sufficient to meet the requirements of the fourth amendment. The district court correctly ruled that the affidavit as excised established probable cause for issuance of the warrant to search appellant's dwelling, and that a valid warrant had issued.

### III.

We consider appellant's two claims concerning remarks made in the prosecutor's opening statement together. Objection was taken by defendant's trial counsel to the Government's mention of defendant's involvement in prior counterfeiting activity. The prosecutor explained to the jury that he proposed to offer the evidence of the prior acts, to show that Grimaldi's possession of photonegatives of the C–'6420' note was with the criminal intent to use them in a counterfeiting operation. The prosecutor also explained that such evidence would corroborate a witness to be called by the Government who would testify that Grimaldi had admitted prior counterfeiting activity. Defendant's counsel moved for a mistrial at the conclusion of the opening statement. The trial judge denied the motion with the comment that he would determine whether the probative value of the evidence outweighed its prejudicial effect when the evidence was offered. The judge later ruled the evidence inadmissible after hearing proffer of it in the absence of the jury. No curative jury instructions were request-

ed by defendant, and none were given by the trial judge. However, counsel for defendant was then afforded opportunity to renew the motion for mistrial, and he declined. Appellant now contends that denial of the motion for mistrial at the conclusion of the opening statement required the trial judge to give cautionary instructions "in a timely fashion". In his brief appellant suggests that failure to give such instructions denied him due process of law.

■ At the outset there is the critical question whether appellant properly saved in the district court for review here the ground of objection to the opening statement. When the evidence was ruled inadmissible, the jury was still left aware of defendant's prior involvement in some other criminal activity from the prosecutor's statement. Had defendant accepted the opportunity to renew the motion for mistrial at this point, the trial judge could have weighed the possible prejudicial effect of the statement and taken appropriate measures to mitigate any harmful effect. On the other hand, when defendant's counsel responded to the question whether he intended to renew the motion, saying, "I'm not sure whether I want to move for a mistrial", the district judge quite properly could have concluded that counsel had made a tactical decision to let the matter rest, or in any event that the court was not then expected to take any curative action either by granting a mistrial or by appropriately instructing the jury. Thus there would appear to be no ground of objection saved for review in this court. But if it be assumed that appellant's claim is properly before us, we find it without merit.

■ The proper function of the opening statement of the prosecutor is limited to a discussion of the evidence which he intends to introduce and believes in good faith is admissible and available. This court has held that evidence "otherwise relevant is not rendered inadmissible merely because its tendency is to prove the commission of some other crime". *Green v. United States*, 176 F.2d 541, 543 (1st Cir. 1949).

Evidence of a defendant's prior offense may be admissible to prove defendant's intent when it is a factor of the crime for which he is presently on trial. *United States v. Hopkinson*, 492 F.2d 1041 (1st Cir.), *cert. denied*, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1139 (1974) (Prior criminal acts of marijuana importation and sale were admissible *inter alia* as prior similar acts to prove intent to distribute marijuana.); *United States v. Easley*, 505 F.2d 184 (9th Cir. 1974) (Evidence of prior conviction of passing counterfeit bills was properly admitted in defendant's subsequent trial on conspiracy charges where a jury instruction limited the use of the evidence to the issue of criminal intent.). *Cf.* Fed.R.Evid. 404(b). The prosecutor stated the purpose for which he proposed to offer the evidence, and his reliance on *United States v. Eatherton*, 519 F.2d 603, 611 (1st Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975), for his expectation that evidence of the prior offense would probably be ruled admissible cannot be adjudged wholly without support. No question of the prosecutor's good faith is raised; all defendant will say is that the prosecutor intended to say what he did.

We do not find in this case that the comment of the prosecutor was so clearly prejudicial that, absent a curative instruc-

tion to mitigate its effect, reversal is required. Given the character of the appellant's defense [7] and the weight of the evidence against him, it is by no means clear that the jury viewed the comment as bearing solely on the character of the defendant and that they convicted him only because they concluded his character was bad. In his brief appellant concedes that the exclusion of the evidence "indicated to the jury that . . . they could not consider the defendant's prior counterfeiting activity". We find that appellant's reliance on *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (Prosecutor knowingly and falsely represented that stained undershorts, allegedly the prisoner's, were stained with blood, when in fact they were stained with paint.) and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (Prosecutor withheld evidence favorable to accused, who was seeking to avoid death penalty, of the degree of his involvement in the crime.) is misplaced.[8] The record of the case here shows an isolated comment by the prosecutor, not repeated during trial, of what he expected in good faith to produce as evidence. We do not believe that the prosecutor's comment, absent an adequate curative instruction, made the trial unfair as to deny appellant due process of law.[9]

---

**7.** A brief summary of Grimaldi's testimony showing his defense follows. He testified that he purchased printing equipment for the purpose of publishing a "tout sheet" for bettors at horse race tracks; that he intended to print a copy of a $10 bill on the "tout sheet" as an "eye catcher" for bettors; that Suprenant worked with him; that Grimaldi used the camera to practice taking pictures of food stamps and $10 and $20 bills; that negatives of bills were in an envelope in his cellar; that he had books in his home on currency for reference to inform himself of the value of a $50 bill issued in 1934; that none of the equipment was purchased or used by him for counterfeiting purposes; that he returned to his home one night and found Suprenant in a drunken condition in his cellar using the printing equipment to produce prints of $10 bills; that the next day he and Suprenant collected "all the stuff [Suprenant] had printed" and put it in paper bags with plates and negatives and took them to Suprenant's sister's home and started to burn them, but the burning was interrupted when Suprenant's parents appeared; at a later time

he and Suprenant took the remainder of the "stuff" to New York and discarded it in a dump; that shortly thereafter he parted company with Suprenant; that later he accused Suprenant of passing some of the bills that were printed; that Grimaldi did not pass any counterfeit bills and did not engage in counterfeiting activity.

**8.** Appellant apparently places much reliance on *United States v. Gallagher*, 576 F.2d 1028 (3rd Cir. 1978), but it is misplaced. The challenged opening statement there was made by the defense attorney, not the prosecutor. The character of the remarks was viewed by the Court of Appeals as "an insult to the court given in the presence of the jury . . .". The case has no application here.

**9.** This case should serve to remind Government attorneys in a criminal case of the unnecessary risk of injecting the danger of irremediable prejudice in a trial by the opening statement. Reference in the opening to a defendant's prior offenses may be found by the trial court in

## IV.

■ Finally, we come to the claim that "[b]ecause Suprenant's testimony is the fruit of the illegal search of February 23, 1978, it too must be suppressed". In the district court defendant took no steps to suppress this testimony before trial, and raised no objection at the trial to the admission of the testimony on the ground sought to be raised here. Appellant's reference to the "illegal search of February 23, 1978" is not supported by any finding. Because this issue was not presented to the district court, and no exceptional circumstances exist to justify review of it, we will not consider the claim.

*Affirmed.*

---

certain cases too clearly prejudicial for a curative jury instruction to mitigate its effect, resulting in mistrials. It is the trial judge's prerogative, not the prosecutor's, to balance the prejudicial potential of evidence against its probative value. Prosecutors should consider postponement of mention of prior offenses until ready to present the evidence, and preferably after notice of its character to the trial judge out of the hearing of the jury. If a prosecutor believes that the Government will be prejudiced by the postponement, the evidence should be called to the attention of the trial judge before the opening statement is made and, in any event, before mention of it in the presence of the jury. In such instance the trial judge may permit postponement of mention of prior offenses in the exercise of discretion.