## COMMONWEALTH vs. NATHANIEL ATKINS.

Norfolk. March 4, 1982. — June 24, 1982.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, & NOLAN, JJ.

*Constitutional Law*, Admissions and confessions, Waiver of constitutional rights. *Waiver. Homicide. Witness*, Impeachment, Accomplice. *Evidence*, Other offense. *Practice, Criminal*, Admissions and confessions, Instructions to jury, Assistance of counsel, Argument by prosecutor.

At the trial of indictments charging murder in the first degree the judge was warranted in resolving conflicting testimony concerning police coercion of the defendant in favor of the Commonwealth and correctly concluded that the Commonwealth had sustained its burden of showing a knowing, intelligent, and voluntary waiver by the defendant of his right to remain silent while in police custody. [596-599]

The judge at the trial of indictments for murder properly refused to allow the impeachment of a key government witness either by means of a prior conviction, where defense counsel did not offer a certified copy of the record of the conviction, or by means of testimony concerning a specific act of misconduct. [599-600]

Evidence of the circumstances in which a defendant slowly strangled one of two murder victims warranted jury instructions with respect to first degree murder based upon extreme atrocity or cruelty in the killing of that victim. [600-601]

At the trial of indictments for murder, there was no evidence which would have warranted jury instructions concerning manslaughter. [601]

At a criminal trial the judge's instructions correctly described the standard of proof beyond a reasonable doubt, and were sufficient to resolve any confusion that might have resulted from the prosecutor's reference to certainty "in your heart and mind." [601-602]

The judge at the trial of indictments for murder correctly instructed the jury on the factors to be assessed in determining the credibility of a key government witness, including the question whether the witness was an accomplice and the issue of duress as it bore on her credibility as a possible accomplice. [602-604]

On appeal of murder convictions, the claim that experienced defense counsel's treatment of the defendant's failure to testify resulted in reversible error was frivolous. [604-605]

Closing argument by the prosecutor at a murder trial did not go beyond
the inferences that could fairly be drawn from the evidence and, in
view of instructions by the judge, presented no prejudice. [605-606]

INDICTMENTS found and returned in the Superior Court
Department on June 10, 1980.

The cases were tried before *Mulkern,* J.

*Robert L. Sheketoff* for the defendant.

*Charles J. Hely,* Assistant District Attorney, for the Com-
monwealth.

LIACOS, J. Before us is an appeal from two convictions of
murder in the first degree. The defendant was convicted by
a jury on January 27, 1981. He was sentenced to consecu-
tive terms of life imprisonment. The defendant argues
numerous errors, based mainly on the judge's instructions to
the jury. Finding neither error nor an occasion to exercise
our powers under G. L. c. 278, § 33E, we affirm.

There was evidence before the jury of the following facts.
On May 1, 1980, the bodies of Kathalyn Davidson and Wil-
liam Coleman were discovered in the basement apartment
which the two shared at 10 Beals Street in Brookline. Both
victims had been strangled, and, in addition, Coleman had
been stabbed repeatedly. The estimated time of death was
set by the medical examiner at Tuesday, April 29, but the
actual time could have been as much as forty-eight hours
earlier.

Acting on information provided by an informant, State
police investigators, in conjunction with Brookline and
Boston police, attempted to interview certain of the victims'
friends and acquaintances. Among these was the defend-
ant, whom the police were unable to locate until some
months later, after he had been indicted for the murders.

The principal witness for the Commonwealth was Linda
Mueller. She testified that she had once lived with the de-
fendant. In April of 1980 she was working as a prostitute.
Early on Monday, April 28, shortly after 2 A.M., the defend-
ant came to see Mueller at her apartment. He was driving
an orange Chevette automobile registered to another woman.

The defendant and Mueller drove to Beals Street in Brookline. The defendant rang the doorbell of the victims' apartment, and Ms. Davidson answered. Davidson was acquainted with both Mueller and the defendant and let them in. As they entered, the defendant asked Davidson if "Billy" was at home, a reference to Coleman. She replied that he was in another room sleeping. Davidson, Mueller, and the defendant sat in the living room conversing. Approximately one-half hour later, the defendant entered the room where Coleman was sleeping, which was a combination kitchen-bedroom. Shortly thereafter, as the two women sat in the living room, they heard sounds of struggle. Davidson screamed, and Mueller cautioned her to be quiet "so she wouldn't get hurt." Coleman was heard moaning for what seemed like one-half hour.[1] The defendant came back to the living room, handed Mueller a knife, and told her to go into the other room and stab Coleman. She pretended to stab Coleman, who was lying on the floor, moaning and bleeding. The defendant then twisted a belt around Coleman's neck and told Mueller to hold it, threatening to leave "three bodies instead of two" if she did not.[2] Mueller did as she was told and held the belt for a few minutes. After this time, Coleman made no further sound. Mueller and the defendant then returned to the living room. The defendant then began choking Davidson, using his arm first, and then his belt. During this time he instructed Mueller to watch Davidson's face for signs of life, and commented that "it's taking her a long time to die."[3] When Davidson was dead, the defendant went about the apart-

---

[1] A neighbor living directly above the victims' apartment corroborated much of this testimony.

[2] The forensic pathologist testified that, in his opinion, Coleman was still alive prior to being strangled, although the stab wounds were themselves "potentially fatal."

[3] Mueller testified that Davidson was still alive when her alarm clock went off at 5 A.M. This testimony was corroborated by the upstairs neighbor, who testified that she heard "scuffling noises and very loud screaming" at 4 A.M., followed by an alarm clock ringing at 5 A.M.

ment and wiped off the doorway and ash trays, as well as some glasses he had used. Shortly before leaving, he took material from a closet and tied a garrote around each victim's neck. Mueller and the defendant left the apartment between 6:30 and 7 A.M. and drove away.[4]

On May 1 the defendant called Mueller and told her the bodies had been found. That night they left Boston, staying first in Rhode Island and then in New York City. After a few days they returned to Boston. When the defendant learned that police had been to his house looking for him, he moved to Worcester.[5] When he learned, via newspaper, that he had been indicted by a grand jury for the crimes, he left by bus for California.

The bulk of the defendant's claims of error center on various aspects of the charge to the jury. With these, and with all the assignments of error, we have made a division into two categories: those based on objections made at trial, and those argued for the first time on appeal. With regard to this latter category, we limit our review to the question whether the challenged action created a substantial risk of a miscarriage of justice. G. L. c. 278, § 33E. *Commonwealth* v. *Porter*, 384 Mass. 647, 656 (1981). *Commonwealth* v. *Williams*, 378 Mass. 217, 227-228 (1979). We treat the former category first.

*Admissibility of the defendant's tape-recorded statement.* On July 11, 1980, while he was in custody and just after he had been returned to Massachusetts from California, the defendant gave a tape-recorded statement to the assistant district attorney who was to prosecute the case. This recording was eventually played for the jury at trial, after a voir

---

[4] Again, the upstairs neighbor basically corroborated this testimony. After his arrest, the defendant gave a statement to the assistant district attorney in which he admitted driving with Mueller in the car in question from 2 A.M. until 6 A.M. on the alleged date of the murders. The tape of this interview, in which the defendant also denied involvement in the murders, was played for the jury.

[5] Several other witnesses testified to the defendant's movements during this period. Moreover, in the tape recording of the defendant's statement, he admitted to this series of movements.

dire on its admissibility. The three witnesses at the voir dire were Mr. Robert W. Banks, the prosecutor, Joseph Brooks, a State police officer assigned to the Norfolk County district attorney's office, and the defendant. The defendant had surrendered himself to California authorities in late June, 1980. He waived rendition at a hearing at which he was represented by appointed counsel. Mr. Banks and Officer Brooks visited the defendant in Oakland City jail on July 9, at which time they gave him Miranda warnings. He made no statement at that time, and they did not see him again for another two days, when they picked him up to return him by air to Boston. The defendant was again given Miranda warnings and indicated that he did not wish to make a statement. Both Mr. Banks and Officer Brooks testified that they did not interrogate the defendant during the flight. Both testified that about one-half hour before the aircraft arrived in Boston, the defendant requested to speak with Mr. Banks. This conversation was deferred until after the party arrived at the State police facility at Logan Airport.

The defendant claimed that, during the flight, Officer Brooks tried to persuade him to talk about the case by mentioning the possibilities of his receiving the death penalty and of his fiancee being charged as an accessory after the fact.[6] He claimed that he was given an alcoholic drink and had had very little sleep for a few days prior to the trip. The defendant admitted that he understood his rights as given and that he could think and make decisions. He nonetheless characterized his act of giving a statement as one done "[w]illingly, understandingly under duress" because of the conduct of Officer Brooks. The record does not show that the defendant requested counsel at any time prior to giving his statement. Prior to making his statement, the defendant was allowed to make a phone call.

---

[6] Officer Brooks denied having had such a conversation with the defendant. Mr. Banks claimed that he informed the defendant of the possibility of a sentence of death *after* the defendant had made his statement. At that time Mr. Banks also informed the defendant of Linda Mueller's testimony against him before the grand jury.

In the statement itself, the defendant admitted both that he was with Mueller between 2 and 6 A.M. on April 28 and that he was driving his fiancee's Chevette automobile. He also corroborated much of the Commonwealth's evidence as to his movements after that date. He insisted, however, that the last time he had seen either victim was a week prior to their death.

At the conclusion of the voir dire hearing, the judge ruled that the defendant, "while in possession of all his faculties, knowingly, willingly and voluntarily waived his rights under *Miranda* v. *Arizona*." He found that the defendant was provided with these warnings on at least three occasions. The judge also ruled that the defendant was in full possession of all his faculties and that no coercion of any type was exercised on him. In reaching this latter conclusion, he resolved the conflicting testimony concerning the existence of coercion in favor of the Commonwealth. This conclusion was clearly warranted by the evidence, and we see no reason to disturb it. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 144-145 (1982), and cases cited; *Commonwealth* v. *Williams, supra* at 226. From this, it follows that the statement, obtained some time after the defendant had exercised his right to silence in California, was admissible. The inquiry in such circumstances is whether the person's right to be free from interrogation, once exercised, was "scrupulously honored" before questioning resumed. *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975). See *Commonwealth* v. *Brant*, 380 Mass. 876, 883-884 (1980). Nothing in the record indicates a persistent effort by police to wear down the resistance of a person in custody who has cut off questioning.[7] Compare *Commonwealth* v. *Jackson*, 377 Mass. 319, 327 n.7 (1979). Thus we conclude that his right to silence was "scrupulously honored." Furthermore, we believe the judge correctly concluded that the Common-

---

[7] In fact, Officer Brooks testified that the defendant initiated the request to talk with the assistant district attorney without any prompting from him.

wealth had sustained its burden of showing a knowing, intelligent, and voluntary waiver. Indeed, there is little here to suggest the absence of waiver. See *Commonwealth* v. *Williams, supra* at 226-227.[8]

*Exclusion of evidence of prior misconduct by Mueller.* In conjunction with defense attempts to impeach the credibility of Mueller, she was cross-examined extensively as to promises made to her by the district attorney's office. Among these were promises of protection and of a new identity. She denied, however, that she had been promised help in connection with any criminal charges pending against her. At a bench conference, defense counsel alleged that he possessed evidence that Mueller had stabbed a man in Rhode Island and that Massachusetts authorities had promised the matter would be quashed in return for her cooperation.

A voir dire was held, and among those testifying was Barbara Davis, who was a friend of the defendant, and with whom Mueller had lived. Davis claimed that Mueller had told her of stabbing a "date." Davis further testified that Mueller told her the man had died, but that only she and another woman knew of the incident.[9] The judge ruled that sufficient evidence had been presented to warrant the placing of questions with regard to the alleged stabbing.

When cross-examination in the presence of the jury resumed, Mueller denied any involvement in such an incident. She admitted to having been given living expenses of $100 a week and to having been promised relocation at State expense after trial. More importantly, she affirmed that she had been told that she would not be prosecuted for her role

[8] The defendant argues that he should have been informed "that the Commonwealth had no right to conduct an interrogation without counsel." We note that this is not a case where interrogation was resumed after the defendant had "expressed his desire to deal with the police only through counsel." *Edwards* v. *Arizona*, 451 U.S. 477, 484 (1981). We are not aware of a requirement of per se exclusion of all postindictment statements made in the absence of counsel. See *Commonwealth* v. *Williams*, 378 Mass. 217, 227 n.10 (1979).

[9] Davis later repeated this testimony before the jury.

in the killing of Davidson and Coleman, and that this was an inducement for her testimony. Later, she again denied participation in a stabbing in Rhode Island. She claimed that the only charge then pending against her was a complaint for prostitution.

The judge refused to permit defense counsel to impeach Mueller with evidence of conviction of an offense involving unlawful possession of a straight razor, because he did not offer a certified copy of the conviction. G. L. c. 233, § 21.[10] Defense counsel then proceeded to ask Mueller whether she had ever possessed a razor in Rhode Island, and she replied that she had. After objection by the prosecutor, the jury were instructed to disregard the question and answer.

The defendant argues that by this ruling he was deprived of the opportunity to probe the motives of the key government witness in testifying. The terms of the statute, however, are quite clear on the issue. Evidence of a prior conviction may not be used to impeach a witness's credibility unless a record of it is produced. *Commonwealth* v. *Clifford*, 374 Mass. 293, 305 (1978). *Commonwealth* v. *Turner*, 371 Mass. 803, 809-810 (1977). Evidence of specific acts of misconduct, absent a criminal conviction, is not admissible to impeach a witness. *Commonwealth* v. *Turner, supra* at 809-810. Cf. *Commonwealth* v. *Davis*, 380 Mass. 1, 10-11 & n.16 (1980). There was no error in the judge's ruling.

*The charge on extreme atrocity or cruelty.* The jury were charged, without differentiation between the two indictments, that they could reach a verdict of murder in the first degree if they found that a homicide was carried out with extreme atrocity or cruelty. They were told that they, as representatives of the conscience of the community, were to decide whether such an element was present in the killings

---

[10] In the voir dire earlier, Mueller had admitted that she had been charged in Rhode Island with unlawful possession of a weapon and that the matter had been disposed of in April, 1980, when she paid a fine.

at issue. They were informed that they could consider, among other possible factors, the awareness and length of suffering of the victim.[11] The defendant challenges the instruction only with respect to the Davidson homicide. There was evidence that Davidson was slowly strangled by one whose only concern was the amount of time required for her to die. Although the cruelty evidenced here may not have been as great as in other cases, compare *Commonwealth* v. *Campbell*, 378 Mass. 680 (1979), the marked indifference to her suffering certainly warranted the charge given. *Commonwealth* v. *Golston*, 373 Mass. 249, 260 (1977), cert. denied, 434 U.S. 1039 (1978). There was no error.

*Failure to charge on manslaughter.* Similarly, there was no error in the judge's failure to charge on manslaughter. Defense counsel conceded in a lobby conference during trial that any evidence of provocation of Coleman was "slight." We think there was not even that quantum of such evidence. No charge on manslaughter was warranted. *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245-246 (1981). Quite to the contrary, on the state of the evidence, it would have been error to have given such a charge. *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980).

*The charge on reasonable doubt.* In his closing argument, the prosecutor touched briefly on the standard of proof necessary for conviction. In defining proof beyond a reasonable doubt, he called the attention of the jurors to the concept of moral certainty, which he characterized as a "settled conviction in your minds" and as knowing "in your heart and in your mind" that a defendant is guilty or innocent. Defense counsel objected to these remarks at a subsequent bench conference.

Prior to that, counsel had met with the judge to discuss their respective requests for jury instructions. The defendant requested a definition of "reasonable doubt" as being "a real doubt, based upon reason and common sense after care-

---

[11] Defense counsel objected to the giving of the charge, but not to the law as given. An instruction on premeditation was also given.

ful and impartial consideration of all the evidence in the case." The judge indicated instead that he would base his charge on the "moral certainty" language of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850).

We have reviewed the charge given by the judge. The explanation of reasonable doubt hewed closely to the "time-tested language" of *Webster. Commonwealth* v. *Wood*, 380 Mass. 545, 550-551 (1980), and cases cited. See *Commonwealth* v. *Robinson*, 382 Mass. 189, 197-198 (1981); *Commonwealth* v. *Williams, supra* at 235. There was no error in the judge's instructions on reasonable doubt.

The question remains whether the prosecutor's recitation of the standard of proof, with its reference to the heart as a source of decision-making, misstated the law seriously enough in context to constitute error. The defendant argues that this phrase, coupled with the charge as given by the judge, left the impression that the standard of proof is based on morality and the heart, as opposed to reason. We disagree. Before reaching the issue, the prosecutor informed the jury that they would be fully informed on the appropriate standards of law by the judge. Cf. *Commonwealth* v. *Geagan*, 339 Mass. 487, 518, cert. denied, 361 U.S. 895 (1959). Thus the jury were forewarned to place little emphasis on his version. We think the challenged statement of the prosecutor did not distract from what was otherwise essentially the language of *Commonwealth* v. *Webster*, *supra*. Finally, the judge's charge, though it did not specifically refer to the prosecutor's language, amply resolved any confusion it might have caused. Cf. *Commonwealth* v. *Killelea*, 370 Mass. 638, 648-649 (1976) (judge's instructions failed to cure gross misstatement of law by prosecutor in closing).

*Instructions concerning witness credibility.* We turn next to those assignments of error which do not rest on objections made at trial. The thrust of the defendant's case was towards negating the credibility of Linda Mueller. The only two witnesses called by the defendant testified to prior inconsistent statements made by her and to a number of alleged

inducements by the Commonwealth which prompted her testimony. Defense counsel's extensive cross-examination, and most of his closing argument as well, were directed to this same end.

The defendant's primary claim of error is that the judge's instructions to the jury on determining witness credibility undermined these efforts. At a lobby conference after the close of all evidence, counsel presented their requests for instructions. Counsel for the defendant requested a strong cautionary instruction on the self-interest of a witness. The judge indicated that he instead would charge the jury to consider "any promises, inducements or offers of reward, if they find such have been made, along with all other indicia of credibility." In the same vein, the judge informed counsel that he would specifically direct attention to the issue of the credibility of an accomplice, but would not give the "close scrutiny" charge requested by the defendant's counsel. Furthermore, the judge indicated that he would instruct on the uses, for impeachment purposes only, of prior inconsistent statements in much the same way he had done, without objection, during trial. Defense counsel raised no objection to the intended instructions on each of these issues as articulated.

In his charge, the judge enumerated several factors the jury could consider in their determination of a witness's credibility. Included were demeanor, the interest of the witness in the outcome of the trial, prior inconsistent statements, ability to observe and to restate, and capacity to remember. This was followed by an instruction on accomplice testimony, which was coupled with one on duress.[12]

---

[12] The judge instructed as follows: "Now, also in this case — and it is applicable in this case, ladies and gentlemen, depending upon your view of the facts — we have a body of law, of evidentiary law, dealing with accomplice testimony. Now, I do not indicate to you that anybody is or is not an accomplice in this case. Is that clear? I am simply stating to you what the law is. An accomplice is one who knowingly, voluntarily and with common intent unites with the principal offender in the commission of a crime. A person who is an accomplice to a crime is a criminal himself or herself and that in itself raises a question of credibility. It does not

There was no error in the instructions on witness credibility as given, taking them individually or together. The instruction given on accomplice testimony was more favorable to the defendant than is necessary under recent decisions of this court. *Commonwealth* v. *Liebman*, 379 Mass. 671, 679 (1980). *Commonwealth* v. *Allen*, 379 Mass. 564, 584-585 (1980). *Commonwealth* v. *Watkins*, 377 Mass. 385, 388-390 (1979). The decision whether Mueller was an accomplice, as it affected her credibility, was left entirely to the jury. See *Commonwealth* v. *Watkins, supra* at 389 n.7. By the same token, the issue of duress, as it bore on her credibility as a possible accomplice, was properly placed before them.[13]

Finally, although the example the judge chose in his closing to define prior inconsistent statements was perhaps narrower than it could have been, we find no error, much less a miscarriage of justice, in the manner in which it was given.

*Instructions concerning the defendant's failure to testify.* Defense counsel requested an instruction from the court that no adverse inferences be drawn from the defendant's exercise of his constitutional right to remain silent. The judge was assured by counsel that he had considered the

---

mean that you cannot believe an accomplice. Whether you should believe the testimony of an accomplice remains for you to say. Now, one who does not act freely, voluntarily and under his or her own free will acts under duress and cannot be considered to be an accomplice. And again, I am not placing any judicial emphasis on any facts in this case. I am simply stating the law to you. Duress is usually taken to require a present, immediate and impending threat of such a nature as to induce a well-founded fear of death or serious bodily injury if the criminal act is not done. The actor must have been so positioned as to have had no reasonable chance to escape. He or she must have been put in a condition of mind where neither he nor she nor a person of reasonable firmness could have acted otherwise in the circumstances."

[13] In *Commonwealth* v. *Robinson*, 382 Mass. 189 (1981), we assumed, without deciding, that a claim of duress was available to meet a charge of homicide. *Id.* at 206 & n.22. We need not decide the issue whether duress would be a defense to the charge of being an accomplice, rather than a principal, in the commission of murder. It suffices to conclude that duress was relevant to the issue of Mueller's credibility.

question carefully and had opted, as a trial tactic, to request the instruction and to address the issue in his closing.[14] The defendant now apparently claims that this combination of the judge's charge and defense counsel's argument to the jury constitutes error. The claim is frivolous. As we have noted previously, the defendant's case consisted solely of an attempt to discredit the testimony of Linda Mueller. Defense counsel's closing remarks focused on the burden which the Commonwealth bears in criminal cases. Included in the discussion was an exhortation to draw no adverse inferences from the defendant's failure to take the stand. A conscious, tactical choice by experienced defense counsel cannot now be converted into a claim of error.[15] See *Commonwealth* v. *Stone*, 366 Mass. 506, 516 (1974); *Grimaldi* v. *United States*, 606 F.2d 332, 339 (1st Cir.), cert. denied, 444 U.S. 971 (1979).

*Error in the prosecutor's closing remarks.* The defendant's final claim of error focuses on a portion of the prosecutor's closing remarks. He claims that the prosecutor introduced facts not in evidence. Undisputed evidence had been presented, through the Commonwealth's witnesses, that, when the bodies were found, the dead bolt lock on the front door was locked, and could not be operated from the outside without a key. Mueller had testified that, when she left the apartment with the defendant, she had not seen him use a key to lock the door. The prosecutor nevertheless suggested to the jury in closing that the defendant not only possessed a key of his own, but that he used it on leaving. The argument made by the prosecutor did not go beyond the bounds of the evidence, or the fair inferences which could be drawn from

---

[14] On several other occasions both the prosecutor and the judge had attempted to skirt issues capable of creating impermissible inferences of the defendant's guilt. On each occasion, again apparently for tactical reasons, defense counsel requested that the issue be discussed. The defendant's decision to remain silent when first interviewed in California was brought out, but there was no objection. The defendant's claim of ineffective assistance of counsel on this basis is wholly without merit.

[15] Appellate defense counsel was not defense counsel at trial.

it. *Commonwealth* v. *Ferreira,* 381 Mass. 306, 316 (1980). Even if we assume that the prosecutor's remarks suggested the existence of facts not before the jury, the judge's instructions negated any possible prejudice. See *Commonwealth* v. *Dougan,* 377 Mass. 303, 311-312 (1979). Furthermore, by no stretch of the imagination was a substantial risk of a miscarriage of justice created.

*Review under G. L. c. 278, § 33E.* Consonant with our duty under § 33E, we have reviewed the record and the transcript. Nothing therein warrants entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*