UNITED STATES of America, Appellee,

v.

**Wallace Joseph CHRISTIAN, Defendant, Appellant.**

**No. 77–1167.**

United States Court of Appeals, First Circuit.

Feb. 23, 1978.

---

Michael A. Malloy, Boston, Mass., by appointment of the court, for defendant, appellant.

Paul E. Troy, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

Appellant was convicted on one count of conspiracy and five counts alleging the substantive offense of transporting or causing the transportation of stolen motor vehicles in interstate commerce. 18 U.S.C. §§ 371,

2312, and 2. On appeal he argues that certain physical evidence should have been suppressed because it was seized as the product of a warrantless search in violation of the Fourth Amendment and that a statement he made during custodial interrogation should have been suppressed because his Fifth Amendment rights were violated. We agree with his second claim and, therefore, reverse and remand this case for a new trial.

## The Fourth Amendment Claim

Special agents of the FBI and local police officers arrested appellant July 7, 1975. A car that appellant was using was parked in the driveway outside the apartment building where the arrest took place. The uncontradicted evidence, as adduced at a hearing on a motion to suppress, is that the officers did not have a search warrant; that the keys to the car were turned over to the officers; that an officer opened a front door to check the vehicle identification number; and that an officer opened the locked trunk and seized certain items found therein. It is these items that the appellant sought to suppress.

█ Appellant testified at the hearing that the officers had ordered him to turn over the keys and that before they opened the trunk he asked them not to search the trunk because he had personal items stored in it. Appellant's sister, who was present at the time, corroborated his story. The district court, however, chose to discredit their testimony and believe Special Agent Scott who testified that he had asked if he could examine the car and that appellant had consented and asked his sister to furnish the keys. Scott further testified that appellant expressed no objection to the search of the trunk before the trunk was opened. On the basis of its evaluation of the credibility of the witnesses, the court found that the warrantless search was justified as a consent search,[1] and the consent was not limited so as to exclude the trunk from the scope of the search.[2]

The district court's factual determinations are binding on appeal unless they are clearly erroneous. *United States v. Jobin,* 535 F.2d 154, 156 (1st Cir. 1976); *United States v. Cepulonis,* 530 F.2d 238, 244 (1st Cir. 1976). The trier of fact is of course the sole judge of witness' credibility, and Scott's testimony supports the court's finding. Therefore, we hold that the court committed no error by denying the motion to suppress the items taken from the car trunk.

## The Fifth Amendment Claim

After the events described above, appellant was taken to the local police station and advised of his *Miranda* rights. He was given the standard FBI waiver of rights form which is in two parts.[3] The top part

---

1. We do not express an opinion on the correctness of the district court's alternative holding that the warrantless search was justified by probable cause and exigent circumstances.

2. The court held, "Defendant's testimony that he restricted the search when he authorized delivery of the keys to the agent is not reasonably probable." The only relevant question, of course, is whether appellant expressed such a restriction at any time before the trunk was open. We assume, however, that "when" in the above sentence is a logical rather than temporal connector, and that the court meant that delivering the keys was inconsistent with the restriction. This interpretation is compelled by a reading of the transcript which reveals that appellant did not testify that he restricted the search at the time he delivered the keys. Thus, the court's statement is a comment on appellant's credibility rather than

an indication that the court was focusing on a legally irrelevant question.

3. The form reads in substance as follows:
"YOUR RIGHTS
Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before questioning if you wish.
If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

sets out the rights, and the bottom sets out a waiver. There is a line for a signature below the waiver.[4] Appellant did not place his signature on that line. He signed the form below the statement of rights, but above the waiver. While transporting appellant into Boston, Scott engaged appellant in a conversation unrelated to the case, then at some point Scott "asked him if he had anything he wanted to say to me concerning this arrest or the indictment or concerning the stolen cars in the indictment."[5] According to Scott, testifying at the suppression hearing, appellant replied, "With what you have got now, you have got me. I want to talk to you, however, I would like to talk to an attorney first."[6] Scott asked no more questions about the case.

At the suppression hearing, appellant testified that he signed the form to indicate he understood his rights. Scott was asked, "And did he sign a standard FBI Waiver of Rights Form?" Scott answered, "Yes, he did." Appellant's counsel asked the United States Attorney if he had the form. The U.S. Attorney responded that he did not have it. The court ruled that the statement was admissible.[7] Had the matter rested here, we might have had little problem in upholding the court's ruling, because on the evidence before it at that time, it could believe Agent Scott and find that appellant had voluntarily waived his right to remain silent.

WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed _____."

4. This is the same form that we set out and commented on in United States v..Goldman, 563 F.2d 501, 503–04 n. 1 and n. 3 (1st Cir. 1977). See infra, note 9.

5. It is important to note that appellant's statement was a response to a question about the case. It was not volunteered. See Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The form was introduced at trial as an exhibit for identification by the prosecution. Thereafter appellant objected to Scott's testifying about appellant's statement and moved the court to strike the testimony once it had been admitted. Later appellant introduced the form as evidence and made a point of showing the jury where the signature was placed. Appellant testified that he did not sign the waiver and that when he signed he thought he was effecting his right to remain silent. He stuck to that story on cross-examination.

■ The Supreme Court has made it clear that an accused person in custody has the absolute right to remain silent and to have an attorney present during any question. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). These rights, and others, are necessary to protect the accused's Fifth Amendment privilege against self-incrimination. The Miranda Court decided that any custodial interrogation was inherently coercive and that, therefore, careful procedures were needed to protect the accused. Miranda, supra, at 455–58, 86 S.Ct. 1602. Merely giving warnings to an accused does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible. "The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary

6. According to appellant, he said, "With what you have there, I want to speak to my attorney." At trial Scott reported, "He replied: With what you have now, you got me. He told me that he wanted to talk to me about this matter at a later date, but he wanted to speak with a lawyer first."

7. In ruling that the statement was admissible, the court addressed only the question of whether it was necessary to rewarn appellant of his rights after he was transferred from the police station into the car in which he made the statement. Implicit in that ruling, of course, was a finding that other prerequisites to admissibility were satisfied. We need not address the question about rewarning.

ritual to existing methods of interrogation." *Miranda, supra,* at 476, 86 S.Ct. at 1629 (emphasis added). The warnings guarantee that the accused knows what his rights are. But *Miranda* requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them. The accused's "freedom to decide whether to assist the state in securing his conviction", *In re Gault,* 387 U.S. 1, 47, 87 S.Ct. 1428, 1454, 18 L.Ed.2d 527 (1967), cannot otherwise be protected fully. "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." *Miranda, supra,* 384 U.S., at 479, 86 S.Ct., at 1630.

There is no question that appellant was read his rights and that he understood them. By his own testimony at trial he admitted as much. The only question is whether he waived those rights. These are distinct questions. The passages quoted above, and others in *Miranda,* demonstrate that both warnings and waiver are prerequisites. One cannot substitute for the other. The privilege against self-incrimination must be voluntarily relinquished, *id.* at 476, 86 S.Ct. 1602, and "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id.* at 475, 86 S.Ct. at 1628.

■ As we have said, Scott did testify at the suppression hearing that appellant had signed a waiver form. Appellant himself testified that he had signed the form, though with the qualification that he had done so "to show I had been given my rights." On the record as of the suppression hearing we might not overturn the court's implicit ruling that appellant had voluntarily waived his rights. When the objection to admission of appellant's statement was renewed at trial, however, there was additional evidence before the court, the form itself. We are concerned about considering the form because appellant's attorney never precisely focused the court's attention on placement of the signature and never precisely argued that the form showed that appellant had not waived his rights. Defense attorneys cannot be encouraged to present issues to the trial court but hold back important arguments in hopes of creating an appealable issue.

We are convinced, however, that appellant's trial attorney was not deliberately holding anything back even though the precise issue was not raised at the suppression hearing or at the time the statement was introduced in court. He did not see the form at the suppression hearing because the government, whose burden it was to show the waiver of rights, did not bring the form to the hearing. Appellant's attorney did ask to see the form, and he probably should not have let that request drop so easily. But his conduct is excusable because both Agent Scott and appellant himself gave the impression that appellant had signed the waiver form.

By the time Scott was asked about the statement at trial, appellant's attorney had seen the form. He did renew his objection to admission of the statement, but he did not point specifically to the form. The court, having been misled by Scott's testimony into believing that appellant had signed the waiver and having already ruled on the admissibility of the statement, understandably cut short appellant's attorney's argument. There was no indication that he would have pointed to the form at that time. Later, after introducing the form into evidence, he did show the form to the jury and emphasized the location of the signature. The record does not indicate that the court examined the form at this, or at any other, time. Thus, at least by the end of the trial, the attorney had raised the issue. We cannot see that he had anything to gain by not raising the issue more completely or by not raising it earlier. Certainly he was not sitting back in contemplation of his client, represented by a new attorney upon appeal, arguing plain error or ineffective assistance of counsel.

■ Finally, we are moved by the importance of the Fifth Amendment rights. Courts bear a special responsibility to be careful in evaluating claims that defend-

ants have waived important constitutional rights, even where those defendants are represented by counsel. *See Miranda, supra,* at 475, 86 S.Ct. 1602 (approving *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), as applied to in-custody interrogation). *Johnson, supra,* at 465, 58 S.Ct. at 1023, spoke of the "serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver" of the right to counsel. We think that in this context the court at least must examine the form, when the form is before the court, on which the alleged waiver is based. For all these reasons, we will include this form in our consideration of whether the government carried its burden of proving waiver.

The burden the government carries is not a light one. "This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst,* 304 U.S. 458 [, 58 S.Ct. 1019, 82 L.Ed. 1461] (1938), and we reassert these standards as applied to in-custody interrogation." *Miranda, supra,* 384 U.S., at 475, 86 S.Ct., at 1628. The *Johnson* Court stated that " 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Johnson, supra,* 304 U.S., at 464, 58 S.Ct., at 1023, *quoting Aetna Insurance Co. v. Kennedy,* 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed.2d 1177 (1937).

"The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." *Miranda, supra,* 384 U.S., at 444–45, 86 S.Ct., at 1612.

■ On the circumstances of this case, we cannot find that there was a voluntary, knowing, intelligent waiver. Rather, we find quite the opposite, an express refusal to waive.[8] Appellant specifically refused to sign the waiver on the form presented to him by the FBI.[9] Placing his signature above the waiver was a clear indication that he understood his rights and was choosing to stand on them rather than waive them. At that moment the interrogation should have stopped. No more questions about the case should have been asked until an express waiver was secured. Therefore appellant's statement should not have been admitted at trial.[10]

■ When a trial error infringes on constitutional rights, we must reverse unless we find that the error was harmless beyond a reasonable doubt. *Chapman v.*

---

**8.** This situation is similar to that in *United States v. Barnes,* 432 F.2d 89 (9th Cir. 1970), where the defendants refused to sign a waiver after being advised of their rights. Confronting them later with their co-defendant's statement violated their *Miranda* rights, and made their response inadmissible.

**9.** This case again demonstrates the danger of reliance on the FBI's standard form. *See also United States v. Goldman, supra,* at 503–04 n. 3; *see generally* Faculty Note, *A Postscript to the Miranda Project: Interrogation of Draft Protestors,* 77 Yale L.J. 300, 307–08 (1967). The absence of a line on which to indicate that he understood his rights but did not wish to waive them forced appellant to sign the form in an empty space—the logical place for the additional line to be. The fact that appellant signed the page at all seemed to convince Agent Scott that appellant had waived his rights. This might have been because Scott knew there was only one official signature line, leading him to assume that appellant had placed his signature

there. If there was a separate line above the waiver paragraph (as there is in the Secret Service's waiver form), FBI agents might take a more careful look at the form to see whether rights were being asserted or waived. That in turn might help avoid expensive retrials.

We do not say that any failure to sign in the single space provided would *per se* require finding an express refusal to waive. In an ambiguous fact situation, we could remand to give the trial court an opportunity to consider the significance of the signature's location on the form. In this case, having in mind the presumption against waiver, we see no basis for interpreting this particular signature and its location as other than a deliberate choice not to waive rights.

**10.** Having reached this conclusion, we need not decide whether the statement itself, as reported by Scott, would be a sufficient indication that appellant wished to stand on his rights and speak to an attorney before relinquishing his right not to incriminate himself.

*California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Such doubt can be raised by a "reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963); *Roy v. Hall,* 521 F.2d 120, 123 (1st Cir. 1975). In this case the statement, as testified to by Scott, was definitely incriminating to some degree.[11] The record shows that the prosecutor referred to the statement during his opening presentation,[12] and we can assume he also did so in his final argument though that was not made part of the record. There was other evidence against appellant, but we cannot say that the statement was not a contributing factor to the conviction. The government will have the opportunity to test the strength of its legitimate evidence at a new trial untainted by evidence procured in violation of appellant's constitutional rights.

*Judgment vacated and the case remanded for further proceedings in accordance with this opinion.*

---

11. "The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination." *Miranda v. Arizona,* 384 U.S. 436, 476, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966).

12. The prosecutor's version of the statement was: "With what you have got now, you got me, but I will think about what I want to talk about." *Compare* note 6, *supra.*