**UNITED STATES of America, Plaintiff,**

v.

**Paul DUSABLON and Donald McCue, Defendants.**

**Cr. No. 81–00009–B.**

United States District Court, D. Maine.

March 25, 1982.

William H. Browder, Jr., Asst. U. S. Atty., Bangor, Me., for plaintiff.

Carl McCue, Carl Rella, Bangor, Me., for defendant McCue.

## MEMORANDUM OF OPINION AND ORDER ON MOTIONS TO SUPPRESS

CYR, District Judge.

The defendants are under indictment for unlawfully bringing aliens into, and transporting them within, the United States, and for conspiracy, in violation of 8 U.S.C. §§ 1324(a)(1) & (2) and 18 U.S.C. §§ 2 & 371. The court is presented with motions to suppress evidence under Federal Rules of Criminal Procedure 12(b)(3) and 41. The suppression hearing has been held and the issues have been briefed and argued by counsel. This memorandum contains findings and conclusions as contemplated by Federal Rule of Criminal Procedure 12(e).

## I

### The Facts

#### A. The Surveillance

At approximately 7:15 p. m. on May 7, 1981, U. S. Border Patrol Agent Peter Moran received a telephone call at his residence in the village of Jackman, Maine from U. S. Customs Inspector Paradise at the U. S. Port of Entry, 16 miles north of the village, alerting Moran that a possible "walk-around"[1] smuggle was in progress in the vicinity of the Port of Entry. Agent Moran immediately drove to the U. S. Border Patrol Station and began to patrol in a marked squad car on Route 201 in and around Jackman village. Route 201 is the only north-south route connecting the Port of Entry and Jackman village.

While on patrol, Moran received a radio message from U. S. Customs Inspector Paradise that the defendant, Paul Dusablon, was the driver of a brown station wagon, with Massachusetts plates, which had just entered the United States through the Port of Entry. Inspector Paradise stated that Dusablon was the only occupant of the station wagon at the time it entered the United States and that Immigration Inspector Gosselin was following the station wagon south on Route 201. Inspector Paradise provided Agent Moran with the license-plate number of the station wagon and advised that Dusablon was suspected of involvement in a "walk-around" attempt near the Port of Entry approximately two weeks earlier.

Moran promptly contacted Inspector Gosselin by radio and was advised that Gosselin had followed the station wagon south on Route 201 from the Port of Entry for about six miles, where Gosselin passed the station wagon, observing only a driver in the vehicle. Moran was told that Gosselin continued south on Route 201 to its intersection with the Heald Pond Road, a side road about two and one-half miles south of the point at which Gosselin had passed the station wagon, where he stopped, turned and waited for the station wagon. After several minutes, during which the station wagon did not come into view, Gosselin drove north on Route 201 to the Port of Entry. Gosselin did not see the station wagon on the return trip to the Port of Entry.

Agent Moran radioed instructions to Gosselin, who was then at the Port of Entry, to contact the El Paso Intelligence Center [EPIC] for information on Paul Dusablon. Moran also requested that Gosselin inquire of the Canadian authorities at the Port of Entry as to whether the station wagon had reentered Canada. At about 7:30 p.m., Gosselin radioed Moran that the EPIC check revealed that Paul Dusablon was suspected of smuggling activity and that he might be armed and dangerous. Gosselin reported that the Canadian authorities had advised that the station wagon had not returned to Canada.

At approximately 7:45 p. m. Agent Moran, who was patrolling in a northerly direction on Route 201, met a station wagon fitting the description of the Dusablon vehicle heading south on Route 201 about two miles north of the village. Moran turned and followed the station wagon for about two miles, meanwhile confirming the license-plate number by radio with Inspector Paradise. Moran observed that there were two occupants visible in the station wagon, but noted nothing unusual in its manner of operation. Agent Moran testified that there are no side roads, except for approximately six dead-end dirt logging roads, and no habitations, along Route 201 between the Heald Pond Road and the Port of Entry. Moran first spotted the station wagon about five miles south of the intersection of Route 201 and the Heald Pond Road. The record is silent as to whether there are habitations along that five-mile stretch of Route 201, though there are several houses along Route 201 south of the point where Moran first spotted the station wagon.

---

1. A "walk-around" is an illegal entry by aliens who are transported to an area near the border, walk around the authorized entry point and meet again on the other side of the border with their "shepherd" or transporter, who has entered the country legally.

## B. *The Stop*

Agent Moran followed the station wagon south for about two miles and stopped it on Main Street, Route 201, in Jackman village at about dusk. The driver, Dusablon, got out and began walking back toward the patrol car. Moran ordered Dusablon to stop and lean against the station wagon. While frisking Dusablon for weapons, Moran observed through the side window of the station wagon that there were two persons [the aliens] of oriental appearance lying on their backs in the rear section of the station wagon covered with a blanket pulled up to their chins. At the request of Agent Moran, the driver of the station wagon identified himself as Paul Dusablon. Agent Moran positioned Dusablon near the rear of the station wagon and instructed the passenger, who identified himself as Donald McCue, an American citizen, to step outside, whereupon McCue was frisked for weapons. At about this time U. S. Border Patrol Agent Vern Annis arrived at the scene. No weapon was found on either defendant, but Moran noticed that the seat and cuffs of the trousers of the defendant McCue were wet and that he was not wearing shoes.

## C. *The Arrest*

Agent Annis watched Dusablon and McCue as the two adult aliens, a male and female, exited from the rear of the station wagon. Agent Moran noticed that their trouser cuffs were wet and that they were not wearing shoes. After being frisked, the male alien advised Agent Moran that he was from Hong Kong. The defendants and the aliens were placed under arrest. Prior to leaving the scene of the stop and upon request Agent Moran secured the shoes of the defendant McCue and the two aliens from the station wagon. The four subjects were transported to the Border Patrol Station, located on Route 201 about two and one-half miles north of Jackman village. Agent Annis drove the station wagon to the Border Patrol Station, arriving at approximately 8:05 p. m., and assisted in processing the defendants.

## D. *The Warrantless Vehicle Search*

After being told by the aliens that they were Chinese nationals from Hong Kong and that they did not have immigration papers or passports, Agent Annis searched the interior of the station wagon for "passports, immigration documents and such," looking on and under the seats, on the dash and the floor, in the glove compartment and in the luggage compartment located in the floor of the rear section of the station wagon. Agent Annis found and removed some jackets and observed that the luggage compartment contained a spare tire, but no luggage.

While the warrantless search was being conducted by Agent Annis, Agent Moran was investigating the border area, miles from the Border Patrol Station, for further evidence of the walk-around. Upon returning to the Border Patrol Station, Moran learned that Annis had found no immigration papers in the vehicle. Moran further testified that it is routine procedure in these cases to search a vehicle for immigration documents, but that normally, in the absence of a warrant, the search would not extend to "compartments in the car or underneath floors or up above or within the upholstery of the car." *See* Transcript of November 23, 1981 hearing on Defendant's Motion to Suppress Evidence, at p. 52.

## E. *The Search Warrant*

The affidavits of Agent Moran supporting the issuance of the search warrant on May 8, 1981 made no reference to a prior search. Moran was aware that Agent Annis had conducted a search with negative results, but did not know its scope. The affidavits stated that Agent Moran, on the basis of past experience in alien smuggling cases and the facts of this case, believed that a substantial amount of cash was probably hidden in the station wagon.

## F. *The Warranted Search*

On May 9, Agent Moran conducted a thorough search of the station wagon, behind the upholstery and under the dash, in the engine air cleaner, in the rear quarter

panels and in the spare-tire compartment. The spare-tire compartment in the rear interior section of the station wagon had been screwed shut and was found to contain an overnight travel bag with woman's clothing and packages of tissue bearing Chinese labels.[2]

### G. The Oral Miranda Warning

At the scene of the vehicle stop and after the arrest, Agent Moran recited from memory certain *"Miranda"* warnings [3] in the presence of the defendants, who were standing outside the station wagon on either side of Moran approximately four feet apart. Dusablon verbally acknowledged awareness that Moran was speaking to him. Agent Moran did not advise the defendants of their right to have counsel present during any interrogation, nor did he make specific inquiry as to whether they understood their rights. No significant statements appear to have been made by the defendants between the stop and their subsequent receipt of written *Miranda* warnings at the Border Patrol Station.

### H. The Written Miranda Warnings

After being placed in the Border Patrol Station holding cell together, the defendants again were informed of their rights. Agent Annis handed McCue Form I–214, containing the complete *Miranda* warning and a waiver. Annis testified that McCue read the form, acknowledged that he understood it, but refused to sign the waiver.[4] Agent Moran saw U. S. Border Patrol Agent Carnes give Dusablon Form I–214, which Dusablon read. The defendants are able to read. When asked, Dusablon acknowledged that he understood his rights, but refused to sign the waiver.

### I. The Defendants' Statements

After reading the *Miranda* warnings and during the course of a discussion which involved some questioning by the agents, McCue attempted to explain the purpose of the trip to Canada. Dusablon stated that McCue had been with him as he came through the Port of Entry. McCue said: "Yes, I was with my friend." Dusablon went on to explain that they had picked up the aliens hitchhiking on the American side of the border.

When these statements were made the defendants were in the same holding cell, within a few feet of each other and the agents. Three to five minutes later Dusablon stated that he did not wish to say any more. McCue concurred and the interrogation ceased. There were no significant statements made by either defendant thereafter.

### II

### The Motion to Suppress Physical Evidence

Defendants seek the suppression of all evidence obtained after the stop of the Dusablon vehicle, as the fruits of an unlawful stop. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Alternatively, defendants assert that the vehicle searches were unreasonable under the fourth amendment.

### A. Lawfulness of the Stop

The fourth amendment protects "against unreasonable searches and seizures . . . ."

---

**2.** Other items, including 10 pennies, having no demonstrated evidentiary significance, are listed in the search inventory.

**3.** Agent Moran testified that he explained to each of the defendants, simultaneously, "that he was under arrest for alien smuggling; that he had the right to remain silent; anything he said could be used against him in a court of law; he had a right to a lawyer, and if he could not afford one, one would be appointed to (sic) him." Transcript of December 8, 1981 Hearing on Defendants' Motions to Suppress Oral Statements, at 62–63.

**4.** The waiver reads as follows:

WAIVER

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

The stop of the Dusablon vehicle, whether or not arrest had ensued, was a seizure subject to fourth amendment safeguards. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975).

United States Border Patrol Agents are authorized "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). *See* 422 U.S. at 877, 95 S.Ct. at 2578. Within 100 miles of the border, agents are authorized by regulation [8 CFR § 287.1(a) (1964)] to stop and search any vehicle for aliens, without a warrant, pursuant to title 8 United States Code, section 1357(a)(3). But "no Act of Congress [and, *a fortiori*, no departmental regulation] can authorize a violation of the Constitution. . . ." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). *See also* 422 U.S. at 877, 95 S.Ct. at 2578. Therefore, it is the reasonableness of the stop that is at issue.

■ A lawful investigatory stop need not be based on probable cause as the defendants suggest. *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce*, 422 U.S. at 884, 95 S.Ct. at 2581. "Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." [5] *Id.*

The Dusablon vehicle remained under continual surveillance on Route 201 to a point six miles south of the Port of Entry. There is no evidence of any habitation on or along the remote and undeveloped 6 to 8-mile stretch of Route 201 where the Dusablon vehicle remained "at large" for ap-

proximately twenty minutes. *Compare United States v. Cortez*, 449 U.S. at 422, 101 S.Ct. at 697 (Stewart, J., concurring). It was nowhere to be seen on or along Route 201 when Inspector Gosselin returned to the Port of Entry and it had not reentered Canada. It was next seen on Route 201 roughly six to eight miles south of the point of its earlier disappearance. It was kept in constant view by Agent Moran thereafter. Except for the Port of Entry, no authorized border crossing is accessible from or on Route 201.

"When an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *United States v. Brignoni-Ponce*, 422 U.S. at 881, 95 S.Ct. at 2580. The Supreme Court has identified a number of factors an officer may consider in determining "whether there is reasonable suspicion to stop a car in the border area," *id.* at 884, 95 S.Ct. at 2581, including the characteristics of the area, its proximity to the border, recent illegal border crossings in the area, evasion efforts, the number and physical appearance of passengers and the type of vehicle. *Id.* at 884–85, 95 S.Ct. at 2581–82.

Agent Moran first spotted the station wagon on Route 201, the only route connecting Jackman village and the Port of Entry, at a point approximately 13 to 14 miles south of the Port of Entry, after a 20-minute lapse in surveillance. The vehicle fitted the description of the Dusablon vehicle, except that there were two occupants visible in it, whereas only the driver could be seen in the vehicle when it passed through the Port of Entry and until Inspector Gosselin lost contact with it. The reports of fellow officers, *cf. United States v. Cortez*, 449 U.S. at 418, 101 S.Ct. at 695 [permitting consideration of "information

---

**5.** (*Footnote omitted.*) The Dusablon vehicle was the object of official suspicion from the moment it arrived at the Port of Entry. The ensuing surveillance served to heighten official suspicion and to rid the stop of the randomness characteristic of roving-patrol stops. *Compare*

*United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) *with United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Therefore, the resultant stop may more appropriately be termed a surveillance stop than a roving-patrol stop.

from police reports"], reliably informed Agent Moran that the Dusablon vehicle had not been seen by Inspector Gosselin en route to the Port of Entry, that it had not reentered Canada, and that it was driven by one Paul Dusablon, who was suspected of a walk-around attempt at the same Port of Entry two weeks earlier. Agent Moran was familiar with walk-around smuggling operations and with the suitability of both the Dusablon station wagon, see 422 U.S. at 885, 95 S.Ct. at 2582, and the remote and wooded countryside surrounding the Port of Entry for walk-around alien smuggling.

█ The appearance of an unaccounted-for passenger in a station wagon which had just "given the slip" to Inspector Gosselin near the border minutes before and which was being driven by a person suspected of participation in a recent walk-around attempt in the same area, considered in light of Moran's knowledge of the *modus operandi* in walk-around alien smuggling activity, *see id.*, prompted an entirely *reasonable suspicion* that the Dusablon vehicle was involved in a walk-around. These "objective manifestation[s]," *see United States v. Cortez*, 449 U.S. at 417, 101 S.Ct. at 694, strongly substantiate the reasonableness of the suspicion that Dusablon was involved in the illegal transportation of aliens,[6] *see id.* ["must have a particularized and objective basis for suggesting the *particular person stopped* of criminal activity" (*emphasis added*)]. The officer need not exclude every rational alternative in order to arrive at a *reasonable suspicion* of criminal activity. The investigatory stop was lawful.

### B. *Discovery of the Aliens*

█ After the station wagon came to a stop, Dusablon emerged and Agent Moran approached the vehicle. While conducting a weapons frisk of Dusablon,[7] Moran observed through the side window of the station wagon, in "plain view," *see Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971) (plurality opinion), two persons of oriental appearance lying on their backs with a blanket pulled up to their chins. Since Moran had a right, by virtue of the lawful stop, to be next to the station wagon and the discovery of the aliens was inadvertent, the "plain view" exception to the warrant requirement applies. *See id.*

### C. *Lawfulness of Arrests*

█ The observation by Agent Moran of three persons not in the station wagon when it crossed the border about 30 minutes before provided further common-sense support, *see United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), for requiring the occupants to get out of the station wagon, *cf. Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) [requirement that driver exit properly stopped vehicle is a reasonable, routine safety precaution and a *"de minimus"* intrusion]. When McCue and the aliens emerged from the vehicle Moran observed that their pant cuffs and seats were wet and that they were not wearing shoes. At that point, if not well before, there was probable cause to believe that all four individuals were involved in an illegal border crossing, a felony under 8 U.S.C. § 1324. The obtaining of an arrest warrant would have allowed Dusablon and McCue to escape, and the arrests by Agent Moran, an immigration officer empowered to effect these warrantless arrests, were lawful. 8 U.S.C. § 1357(a)(4). *See United States v. Watson*, 423 U.S. 411, 415–424, 96 S.Ct. 820, 823–828, 46 L.Ed.2d 598 (1976).

**6.** Defendants make much of the fact that Agent Moran had observed nothing unusual in the manner of operation of the Dusablon vehicle. Erratic driving can support a reasonable suspicion, *United States v. Brignoni-Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975), but "Border Patrol agents have no part in enforcing laws that regulate highway use...," *id.* at 883, 95 S.Ct. at 2581, and it cannot be supposed that erratic driving is an indispensable element of a reasonable suspi-

cion of involvement in illegal entry and smuggling.

**7.** The reasonableness of the frisk is demonstrated by the fact that Moran had been informed that Dusablon might be armed and dangerous. *See Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968).

## D. *The Reasonableness of the Vehicle Searches*

### 1. *Standing.*

■ Although vehicle ownership itself is not sufficient to establish the requisite "reasonable expectation of privacy" necessary to invest the owner with standing, *see United States v. Dall*, 608 F.2d 910 (1st Cir. 1979), *cert. denied*, 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980), other circumstances support the conclusion that Dusablon did have a reasonable expectation of privacy in the searched vehicle. He was not only its owner, he was operating the vehicle when it entered the country, while it was under surveillance and at the time it was stopped. In these circumstances it is clear that Dusablon had a "presently asserted possessory interest in an owned vehicle," *id.* at 914. Moreover, both searches involved areas of the Dusablon vehicle not open to plain view and the search efforts ultimately focused upon a spare-tire compartment that had been screwed shut in makeshift fashion. These circumstances manifest a reasonable expectation of privacy in the areas searched, particularly the spare-tire compartment. *See id.*

Defendant McCue, on the other hand, a passenger in the vehicle only part of the time, has provided no evidence, nor has he pointed to any evidence in the record, which would show that he had any expectation of privacy in the locus of these searches. McCue has failed to carry the "initial burden of offering facts from which a court might reasonably infer his standing." *United States v. Juan Guilbe Irizarry, et al.*, 673 F.2d 554 at 557 (1st Cir. 1982) (majority opinion). McCue lacks standing to challenge either search.[8] *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

### 2. *The Warrantless Search.*

At the Border Patrol Station, Agent Annis conducted a warrantless search on and under the seats, on the dash and the floor, in the glove compartment and in the luggage compartment located in the floor of the rear section of the station wagon, looking for "passports, immigration documents and such." Although no physical evidence susceptible of suppression was discovered, Dusablon argues that the warrantless search poisoned the fruits of the warranted search subsequently conducted by Agent Moran. The argument takes two tacks. First, the discovery of the spare tire, but no luggage, in the recessed luggage compartment during the course of the warrantless search served to focus official suspicion on the spare-tire compartment, where the suitcase was later found. Second, the failure of Agent Moran to disclose the results of the warrantless search fatally flawed his affidavits and hence the search warrant. It may be presumed for present purposes, without deciding because it is unnecessary to decide, that the warrantless search conducted by Agent Annis was violative of the fourth amendment.

### 3. *The Connection Between the Warrantless Search and the Discovery of the Suitcase.*

■ An earlier, illegal search does not require the exclusion of legitimately discovered evidence not the fruit of information obtained in the illegal search. *Grimaldi v. United States*, 606 F.2d 332, 337 (1st Cir. 1979).

■ The discovery of the suitcase and its contents did not result in any way from information obtained through the earlier, warrantless search of the luggage compartment by Agent Annis. There is no evidence that Agent Moran knew that the warrant-

---

**8.** Were McCue found to have standing to question either search, however, *compare Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) *and Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) *with Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) *and United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the disposition made of the Dusablon challenge would apply with equal force to McCue.

Of course, McCue may possess standing to contest the validity of the investigatory stop. *See* 439 U.S. at 150–51, 99 S.Ct. at 434 (Powell, J. concurring). Having already decided that the stop was lawful, the court need not reach that question.

less search had disclosed a spare tire in the luggage compartment. The only evidence before the court is that Agent Moran was aware that a warrantless search for immigration papers had been conducted by Agent Annis, without success, but there is no evidence that Moran knew the extent of the search. Furthermore, it cannot be seriously supposed that official attention would not ultimately have focused on the spare-tire compartment. It seems certain, especially in light of the thoroughness of the search Agent Moran intended to conduct, that Moran, like Agent Annis, would have discovered the spare tire, but no luggage, in the luggage compartment, regardless of the results of any warrantless search. *See United States v. Gordon*, 655 F.2d 478, 486 (2d Cir. 1981).

### 4. *The Search with Warrant.*

The search conducted by Agent Moran under warrant on May 9 disclosed a suitcase containing woman's clothing and tissues bearing Chinese labels hidden in the screwed-down, spare-tire compartment at the rear of the station wagon. The failure of Agent Moran to disclose in either affidavit an earlier, warrantless search by Agent Annis calls into question the validity of the search warrant.

### a. *The Facial Sufficiency of the Affidavits*

■ The search warrant affidavits must be construed in a common-sense fashion, *see United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965), for purposes of determining the sufficiency of their showing of probable cause, *see Carroll v. United States*, 267 U.S. 132, 158–59, 45 S.Ct. 280, 287, 69 L.Ed. 543 (1925). The gravamen of the issue is the existence of a reasonable probability of success. *See* 380 U.S. at 107, 85 S.Ct. at 745. In the common-sense evaluation of the affidavits "the type of crime, the nature of the [sought-after] items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide [such] property"

may be considered. *United States v. Fortes*, 619 F.2d 108, 114 (1st Cir. 1980) [*quoting, United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970)]; *see United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979).

■ The Moran affidavits disclose that the affiant has had five years of experience as a border patrol agent, including substantial work with alien traffic, as well as specialized training. The affidavits reveal that illegal alien smuggling commonly involves large, contemporaneous cash payments to the smugglers. The affidavits contain compelling representations that the vehicle to be searched was itself being used at the time of its seizure in the smuggling and illegal transportation of aliens. Thus, a firm nexus is established between the object [money] and the locus of the search. *Compare United States v. Fortes*, 619 F.2d 108, 114–15 (1st Cir. 1980) *with United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979). Finally, there was not only sufficient opportunity, but substantial motivation, for the defendants to secrete incriminating evidence, such as money, in advance of the passage of the vehicle through the Port of Entry. The affidavits are facially sufficient.

### b. *The Franks' Tests*

■ The record is clear that Agent Annis conducted an earlier, warrantless search, which was not disclosed by Agent Moran in either of the affidavits submitted in support of the search warrant. A search warrant alleged to be insufficient by reason of the omission of material facts must meet the subjective and objective tests laid down in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In order for a search warrant to be invalidated on the basis of inaccuracies in the supporting affidavits, *Franks* requires that the defendant establish (1) a knowing and intentional falsehood or a reckless disregard for the truth by the affiant, and (2) that a correction of the inaccuracy would have precluded a finding of probable cause. *Id.* at 171–72, 98 S.Ct. at 2684.[9]

---

**9.** Although *Franks* involved misstatements, rather than omissions, courts have treated allegations of material omissions from affidavits

i. *The Subjective Sufficiency of the Present Affidavits.*

■ There is evidence that Agent Moran was aware that Agent Annis had looked inside the vehicle for "immigration papers, passports, and the like," to no avail.[10] But since Moran knew that Annis had driven the Dusablon vehicle from the scene of the arrest to the Border Patrol Station, about two and one-half miles north, Moran may not have been at all aware that the comment by Agent Annis (that there was "nothing" in the vehicle) had reference to the subsequent, rather thorough, warrantless search of the interior of the vehicle by Agent Annis, rather than to a cursory observation of parts of the interior of the vehicle in "plain view," which Annis had the opportunity to make while driving the vehicle to the station.[11]

■ There is simply no evidence that Moran was aware of the extent of the previous search by Annis at the time Moran applied for the search warrant. The subsequent search under warrant greatly exceeded in scope the warrantless search by Annis, including, as it did, areas of the vehicle in which personal items, such as money, would not normally be found but might be secreted, such as in the spare-tire compartment. Given the thoroughness and the clearly distinct object of the search (money) that Moran intended to conduct, it does not seem that he was either reckless or deceptive in failing to reflect in his affidavit that the earlier "search" by Annis had not disclosed

any immigration papers. The information and belief to which Moran attested in his affidavits, that money was probably hidden in the car, seems no less sincere because he was aware that Annis had looked, without success, through some unknown (to Moran) portion of the interior of the vehicle for immigration papers. Moreover, the statement in the affidavit that a substantial sum of money had already been found on the defendants' persons indicates that Moran was attempting to inform the magistrate of previous discoveries considered material to the request for a warrant. Dusablon has not met the burden of showing by a preponderance of the evidence that the omission was the result of anything more than negligence, if that. *See Franks v. Delaware,* 438 U.S. at 156, 98 S.Ct. at 2676; *United States v. Martin,* 615 F.2d 318, 329 (5th Cir. 1980); *United States v. Cortina,* 630 F.2d 1207, 1213 (7th Cir. 1980).

ii. *The Objective Sufficiency of the Affidavits as Supplemented*

Dusablon has not satisfied the second element of the *Franks* test, requiring that the omitted information, if included in the affidavit, would have prevented the magistrate, as a matter of law, from making a finding of probable cause. *See* 438 U.S. at 171–72, 98 S.Ct. at 2684; *United States v. Martin,* 615 F.2d at 329. The court is not persuaded that a warrant to search the vehicle would not have been obtainable, as a matter of

---

under essentially the same analysis. *See United States v. Martin,* 615 F.2d 318, 327–29 (5th Cir. 1980); *United States v. House,* 604 F.2d 1135, 1141 (8th Cir. 1979).

**10.** An evidentiary hearing need not be held as to the truthfulness of the affiant unless the defendant has made a "substantial preliminary showing" of intentional falsity or reckless disregard for the truth. *Id.* at 171, 98 S.Ct. at 2684. It is unnecessary to consider whether the required *preliminary* showing has been made, however, because the evidentiary hearing on the motions to suppress inquired into the circumstances surrounding the omission. *See United States v. Martin,* 615 F.2d 318, 328 (5th Cir. 1980).

**11.** On the basis of their probable-cause belief that the Dusablon vehicle had been used in violating 8 U.S.C. § 1324(a), the agents were

authorized by statute to seize the vehicle without a warrant. 8 U.S.C. § 1324(b)(3). Therefore, the presence of Agent Annis in the vehicle for the purpose of moving it from the public way to the more secure location of the Border Patrol Station was not an unreasonable intrusion. *Cf. South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Pappas,* 613 F.2d 324, 330–331 (1st Cir. 1979) [inventory search following seizure of vehicle reasonable because conducted for "benign" purposes]. It would seem an unsound law enforcement practice to permit suspected felons to operate their vehicles after arrest. Once lawfully in the vehicle, Agent Annis was not required to close his eyes to what was in "plain view." *See Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

law, had the affidavits disclosed the earlier, warrantless search. Disclosure of the warrantless search by Annis could not have impeded in any material respect the required showing of probable cause in these circumstances. The affidavits reveal that the defendants and the Dusablon vehicle were involved in alien smuggling and that a common *modus operandi* in such cases is to secrete evidence of the crime, such as money, in the vehicle used to transport the aliens. It is significant that the defendants' scheme necessitated that the vehicle report at the Port of Entry, giving rise to a strong incentive to hide incriminating evidence in parts of the vehicle not easily visible or likely to be looked into by the inspecting officer at the Port of Entry. The fact that Agent Annis had searched most of the more accessible areas of the vehicle for immigration papers, without success, would make it no less likely that money would be found elsewhere in the vehicle, as Moran believed. Indeed, had all of the facts about the previous search by Agent Annis been disclosed to the magistrate, including the discovery of the spare tire, but no luggage, in the luggage compartment, there would arguably have been *more* reason to believe that the spare-tire compartment, in which the incriminating evidence was actually found, contained the suspected money cache.

### c. *Search Warrant Overbreadth.*

■ Dsuablon argues that the search warrant lacks the required specificity. *See* Fed.R.Crim.P. 41(c). *See also Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976); *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). The scope of the search *authorized* must have been reasonable in light of the information contained in the affidavits, *see, e.g., United States v. Roche*, 614 F.2d 6, 7 (1st Cir. 1980); *United States v. Fortes*, 619 F.2d 108 (1st Cir. 1980), and the extent of the search *conducted* must have been reasonable in light of the search warrant authorization, *see, e.g., United States v. Callison*, 577 F.2d 53, 55 (8th Cir.), *cert. denied*, 439 U.S. 873, 99 S.Ct. 209, 58 L.Ed.2d 187 (1978); *United States v.*

*Kralik*, 611 F.2d 343, 344–45 (10th Cir.), *cert. denied*, 445 U.S. 953, 100 S.Ct. 1603, 63 L.Ed.2d 788 (1980).

■ The locus of the search (the Dusablon vehicle) was described with sufficient particularity in the warrant, *see, e.g., United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979), on the strength of the affidavit identifying the vehicle as the likely location of the object of the search (money), *see, e.g., United States v. Burns*, 624 F.2d 95, 101 (10th Cir. 1980).

■ The affidavits adequately substantiate the determination of the magistrate that money was probably hidden somewhere in the vehicle. A search of the spare-tire compartment disclosed a suitcase. There was no less reason for Moran to believe that the suitcase contained the money. *See United States v. Fortes*, 619 F.2d 108, 114–15 (1st Cir. 1980). Therefore, the scope of the search did not exceed that authorized by the warrant. *See United States v. Callison*, 577 F.2d 53, 55 (8th Cir.), *cert. denied*, 439 U.S. 873, 99 S.Ct. 209, 58 L.Ed.2d 187 (1978); *United States v. Kralik*, 611 F.2d 343, 344–45 (10th Cir. 1979), *cert. denied*, 445 U.S. 953, 100 S.Ct. 1603, 63 L.Ed.2d 788 (1980). Although the clothing and tissues found in the suitcase were not identified in the search warrant, their evidentiary significance was obvious and their seizure reasonable. *See Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971).

### III

*Motion to Suppress Statements*

Dusablon moves to suppress certain oral statements allegedly made without a proper waiver of his right to remain silent. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There appears to be no dispute that the statements were made while the defendants were in custody and that some questioning was involved in eliciting the statements. It remains to be decided (1) whether Dusablon was properly informed of his rights before the interroga-

tion, and (2) whether he knowingly and intelligently waived his right to remain silent. *See Tague v. Louisiana,* 444 U.S. 469, 470, 100 S.Ct. 652, 653, 62 L.Ed.2d 622 (1980) (*per curiam*); *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

## A. *Burden of Proof*

■ "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived" his rights. *Miranda v. Arizona,* 384 U.S. at 475, 86 S.Ct. at 1628. *See United States v. Christian,* 571 F.2d 64, 69 (1st Cir. 1978) [the standard of proof is a "high" one]. The Government must prove each essential element, not bearing on the reliability of the statements, by a *preponderance* of the evidence. *Lego v. Twomey,* 404 U.S. 477, 486–89, 92 S.Ct. 619, 625–26, 30 L.Ed.2d 618 (1972); *United States v. Hackley,* 636 F.2d 493, 500 (D.C.Cir.1980).

## B. *Adequacy of the Warnings*

One of the arguments Dusablon makes is that any waiver of his rights was not knowingly and intelligently made.

At the scene of the arrest, Agent Moran advised Dusablon:

> that he was under arrest for alien smuggling; that he had the right to remain silent; anything he said could be used against him in a court of law; he had a right to a lawyer, and if he could not afford one, one would be appointed to (sic) him.

Transcript, at 62–63. Dusablon heard the recitation of rights, but there was no mention by Moran of the right to have counsel *present during interrogation. See California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (*per curiam*). It is unnecessary to decide whether the omission is fatal, if Dusablon subsequently received entirely adequate *Miranda* warnings and if none of the statements to be introduced were made in the interim. *See, e.g., United States v. Lopez-Diaz,* 630 F.2d 661, 663–64 (9th Cir. 1980).

While in custody in the Border Patrol Station holding cell, Dusablon read a form containing the complete *Miranda* warnings, stated that he understood his rights, but refused to sign the written waiver form. Within the next few minutes, both defendants made statements to the officers, before deciding to refrain from making any further statements, whereupon the interrogation ceased. There is no allegation and no evidence of coercion.

■ Dusablon argues, without citation of authority, that the written *Miranda* warning was improper because it was not read to him. The First Circuit has specifically held to the contrary in circumstances devoid of evidence that the defendant could not or did not read the written *Miranda* warning. *United States v. Van Dusen,* 431 F.2d 1278, 1280 (1st Cir. 1970). Agent Moran witnessed another officer give the *Miranda* form to Dusablon. It is stipulated that Dusablon is able to read. Dusablon read and understood his rights. The affirmative action taken by Dusablon to terminate the interrogation within a very few minutes further supports a finding that he understood his rights. *See United States v. Payton,* 615 F.2d 922, 924 (1st Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980).

## C. *Waiver*

■ Dusablon insists that he cannot be held to have waived his right to remain silent in the absence of an express waiver, particularly in view of his refusal to sign the written waiver. Although *Miranda* did hold that silence alone does not constitute a waiver, 384 U.S. at 475, 86 S.Ct. at 1628, it did not require an express waiver, much less a written one. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). Although "[t]he courts must presume that a defendant did not waive his rights [and] the prosecution's burden is great; ... in at least some cases waiver can be inferred from the actions and words of the person interrogated." *Id.* Moreover, the refusal to sign a waiver is not, in and of itself, determinative. *See id.; United States v. Valle,* 644 F.2d 374, 375–76 (8th Cir. 1981) (*per curiam*) [defendant who

refused to sign waiver form, but indicated willingness to talk, implicitly waived rights]; *United States v. Phillips*, 640 F.2d 87, 93–94 (7th Cir. 1981), *cert. denied*, 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981) [waiver found where defendant refused to sign form, but did make statement without requesting counsel]; *United States v. Payton*, 615 F.2d 922, 925 (1st Cir.) [voluntary and intelligent waiver found, despite refusal to sign 'Advice of Rights' form, where defendant was willing to answer questions and was prepared to terminate questioning at will], *cert. denied*, 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980); *United States v. Cruz*, 603 F.2d 673, 675 (7th Cir. 1979) (*per curiam* ) [refusal to sign waiver relevant, but not controlling], *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980).

 Almost immediately after being informed of his rights, which he said he understood, Dusablon made exculpatory statements concerning where the passengers had gotten into the vehicle. Although some questioning appears to have been involved, the statements were freely forthcoming for the apparent purpose of offering an innocent explanation for the presence in the vehicle of McCue and the aliens. Within a very few minutes, Dusablon decided, along with McCue, to say no more, and they were questioned no more—further evidence of the defendants' control over their "interrogation."

"Once the warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona*, 384 U.S. at 473–74, 86 S.Ct. at 1627. Although adequately warned of his rights, Dusablon did not "indicate in any manner" that he wished to remain silent, *see Miranda v. Arizona*, 384 U.S. 473–74, 86 S.Ct. 1627; *United States v. Rice*, 652 F.2d 521, 527 (5th Cir. 1981), until after these statements were made (at which time the interrogation ceased); nor did he do anything to invoke the right to counsel, which might have triggered the requirement that interrogation cease until an attorney was present. *See*

*Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona*, 384 U.S. at 474, 86 S.Ct. at 1627. There was no significant time lag between the *Miranda* warnings and the Dusablon statements, which might have supported an inference that the decision to speak was inadvertent or made without an accurate recollection of his rights. *See, e.g., United States v. Hopkins*, 433 F.2d 1041, 1044–45 (5th Cir. 1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550 (1971). On the basis of the "totality of the circumstances," *see Fare v. Michael C.*, 422 U.S. 707, 725, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197 (1979), the court finds that Dusablon knowingly, intelligently and voluntarily waived his right to remain silent and to have counsel present.

The motions to suppress must, in all respects, be and hereby are DENIED.